AUSA Stephen L. Hiyama, 313-226-9674
Special Agent Gregory R. Brown, FBI, 734-995-1310

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America

    v.

D-1  RONNIE EDWARD DUKE
D-2  WILLIAM CAMSELL WELLS, III
D-3  WILINEVAH RICHARDSON
D-4  RYAN ANDREW ZUNDEL
D-5  ROBERT CHARLES BRIERLEY
D-6  NICOLE LYNN TURCHECK
D-7  ANTHONY EDWARD PETERS

Case:2:10-mj-30236
Judge: Unassigned,
Filed: 06-16-2010 At 11:04 AM
USA V. DUKE, ET AL. (COMPLAINT) (MR
M)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of _____ in the
_____ District of _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| TITLE 18, U.S.C., SECTION 1349 | SEE ATTACHMENT A. |

This criminal complaint is based on these facts:

SEE ATTACHMENT B.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

GREGORY R. BROWN, SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **6-16-10**

_____
*Judge's signature*

City and state: DETROIT, MICHIGAN

MARK A. RANDON, U.S. MAGISTRATE JUDGE
*Printed name and title*

# ATTACHMENT A

## COUNT ONE
### (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

From the fall of 2003 through approximately July 2007, in the Eastern

District of Michigan, Southern Division, and elsewhere, RONNIE EDWARD

DUKE, WILLIAM CAMSELL WELLS, III, WILINEVAH RICHARDSON, RYAN ANDREW

ZUNDEL, ROBERT CHARLES BRIERLEY, NICOLE LYNN TURCHECK, and ANTHONY

EDWARD PETERS, defendants herein, and other individuals, did knowingly

conspire and agree to engage and participate in a scheme to defraud

mortgage lenders and obtain money and property by means of materially

false and fraudulent pretenses and representations, which scheme was

furthered by the use of interstate wire transfers made to bank accounts in

metropolitan Detroit controlled by the defendants, all in violation of

Sections 1349 and 1343 of Title 18 of the United States Code.

## ATTACHMENT B

### AFFIDAVIT

Gregory R. Brown, being duly sworn, deposes and states:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Detroit, MI, and have been so employed for seven years. Before joining the FBI, I worked in banking for 12 years, including six years in underwriting – the process where banks evaluate potential borrowers and transactions and determine whether to issue loans. For the past five years (approximately), I have investigated white collar crime with a concentration on mortgage fraud.

2. One very large mortgage fraud investigation that I have conducted relates to a scheme embracing over 500 fraudulent mortgage loans and dozens of targets and subjects. Among the targets and subjects are:

> RONNIE EDWARD DUKE,
> WILLIAM CAMSELL WELLS, III,
> WILINEVAH RICHARDSON,
> RYAN ANDREW ZUNDEL,
> ROBERT CHARLES BRIERLEY,
> NICOLE LYNN TURCHECK, and
> ANTHONY EDWARD PETERS.

3. The allegations contained in this affidavit are based on the interviews of scores of witnesses (most of which I participated in), the review by me and other FBI agents and analysts of voluminous records (measured in the hundreds of thousands of pages) obtained from, among other sources, mortgage brokers, title companies, real estate brokers, mortgage lenders, banks, and individual witnesses, and of voluminous records, including electronically stored information, seized in July 2007 pursuant to seven federal search warrants.

**4.** Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. All conversations and statements described in this affidavit are related in substance and in part, and are not verbatim quotations.

**5.** The information and evidence gathered during the course of this investigation establish the existence of the following scheme to defraud mortgage lenders:

A.  From the fall of 2003 through approximately July 2007, in Wayne County, Michigan, and other parts of southeastern Michigan, a number of individuals participated in a scheme to defraud mortgage lenders and obtain money by means of false and fraudulent pretenses and representations.

B.  ***"Real" Loans.*** It was a part of the scheme that mortgage loans would be obtained to purchase residential properties from legitimate sellers. These mortgage loans were often referred to by the participants in the scheme as "real" loans. A "real" loan would be closed at the offices of a legitimate title company. The loan application for a "real" loan and other documents relating to the loan would be materially false and fraudulent in one or more of the following ways:

(1)  The borrower described on the loan application (Fannie Mae Form 1003), the nominal borrower, was not the true borrower but merely someone with an acceptable credit history who was recruited to assume the role of the borrower and who was paid a substantial amount of money to play that role.

(2)  The 20% down payment to the seller, which the loan application stated would be paid from the nominal borrower's own funds, would be paid instead from the proceeds of another mortgage loan obtained by fraud or with funds provided by another participant in the scheme.

(3)  The nominal borrower who, according to the loan application, intended to use the subject property as an "investment" had no intention of fulfilling the ordinary responsibilities of owning a residential investment property, that is, maintaining the property, leasing the property to a reliable tenant, and using his or her own income (particularly rental income) or assets to make the monthly loan payments, pay the real estate

taxes, and secure adequate insurance for the property.

(4)  The lease agreement, if one was submitted, between the nominal borrower and a third-party tenant, which purported to show that the nominal borrower would receive a stream of rental income in the future, was bogus.

(5)  The nominal borrower who, according to the loan application, intended to use the subject property as his or her "primary residence" had no intention of moving to the subject property and residing there or otherwise fulfilling the ordinary responsibilities of owning a residential property, that is, maintaining the property and using his or her own income or assets to make the monthly loan payments, pay the real estate taxes, and secure adequate insurance for the property.

(6)  The verification of deposit (VOD), if one was submitted, which purported to support the representation in the loan application that the nominal borrower had a bank account with a large balance, was fraudulent because the account balance had been inflated by a temporary transfer of funds into the account that did not belong to the nominal borrower.

C.  It was a part of the scheme that the legal title for a subject property purchased through a "real" loan would be conveyed from the seller to the nominal borrower through a warranty deed, thereby enabling the participants in the scheme to control the subject property, which would be referred to by them as a "controlled" property.

D.  From time to time, and for various reasons, a "real" loan would not close, and the subject property would not be purchased by, and the title to the subject property would not be transferred to, the participants in the scheme.  Still, the address and legal description of the subject property would be used by the participants in the scheme, without the knowledge or consent of the true owner of the subject property.  In this situation, the subject property would be referred to as an "uncontrolled" property.

E.  *"Ghost" Loans, or "G" Loans.*  It was also a part of the scheme that a second category of mortgage loans would be obtained, which were often referred to by the participants in the scheme as "ghost" loans, or "G" loans. There were many more "G" loans than "real" loans, and it was the "G" loans that enabled the participants in the scheme to enrich themselves.  The loan application for a "G" loan and other documents relating to the loan would be materially false and fraudulent in one or more of the following ways:

(1)  The ostensible sale of the subject property by the nominal

- 3 -

seller to the nominal borrower was a sham:

- the nominal seller was the individual holding the legal title to the subject property at that time, who was either

  o a nominal borrower in a "real" loan transaction involving the subject property, described above in Paragraph 5, or

  o the true owner of the subject property, who was unaware of the "sale" of his or her property and the related "G" loan, and

- the nominal borrower described on the loan application (Fannie Mae Form 1003) was not the true borrower but merely someone with an acceptable credit history who was recruited to assume the role of the borrower and who was paid a substantial amount of money to play that role.

(2) The agreement to purchase the subject property between the nominal borrower and the nominal seller was bogus.

(3) The nominal borrower who, according to the loan application, intended to use the subject property as an "investment" had no intention of fulfilling the ordinary responsibilities of owning a residential investment property, that is, maintaining the property, leasing the property to a reliable tenant, and using his or her own income (particularly rental income) or assets to make the monthly loan payments, pay the real estate taxes, and secure adequate insurance for the property.

(4) The lease agreement, if one was submitted, between the nominal borrower and a third-party tenant, which purported to show that the nominal borrower would receive a stream of rental income in the future, was bogus.

(5) The nominal borrower who, according to the loan application, intended to use the subject property as his or her "primary residence" had no intention of moving to the subject property and residing there or otherwise fulfilling the ordinary responsibilities of owning a residential property, that is, maintaining the property and using his or her own income or assets to make the monthly loan payments, pay the real estate taxes, and secure adequate insurance for the property.

(6) The verification of deposit (VOD), if one was submitted, which purported to support the representation in the loan application that the

- 4 -

nominal borrower had a bank account with a large balance, was fraudulent because the account balance had been inflated by a temporary transfer of funds into the account that did not belong to the nominal borrower.

(7)  The cashier's check payable to the nominal seller, which purported to represent the 20% down payment to the seller, was obtained to deceive the mortgage lender, was subsequently canceled, and did not result in the transfer of funds.

(8)  No legitimate title company was involved in the transaction. The title insurance documents, which purported to insure that the nominal seller had clear title to the subject property to convey to the nominal borrower and that the mortgage lender's lien on the subject property would therefore be the first lien on the property, were counterfeit.

(9)  The warranty deed purporting to transfer title from the nominal seller to the nominal borrower was created to deceive the mortgage lender and was never recorded in the county register of deeds.

(10)  The mortgage document purporting to convey a mortgage interest in the subject property to the lender to secure the nominal borrower's debt to the lender was created to deceive the mortgage lender and was never recorded in the county register of deeds.

(11)  There was no real closing, or settlement, of the loan, and the settlement statement (Form HUD-1) was created to deceive the mortgage lender.

(12)  The purpose of a "G" loan was not to enable the nominal borrower to purchase the subject property from the nominal seller, but to add funds to a pool of money used by the participants in the scheme to:

- enrich the participants in the scheme,

- make the required 20% down payment to the legitimate sellers of the residential properties that were purchased by the participants in the scheme with "real" loans, and

- make the monthly payments on "real" loans and "G" loans.

F.  It was also a part of the scheme that the same residential property would, in the usual situation, be used simultaneously as the collateral for one "real" loan and the ostensible collateral for two or more "G" loans, with each loan being funded by a different lender.

G.  It was also a part of the scheme that the mortgage loans applied for would be those that required a 20% down payment.  Such loans did not require the establishment of escrow accounts controlled by the lenders for the payment of real estate taxes.  As a result, the real estate taxes on the subject properties would be paid not by the lenders but by the participants in the scheme through direct payments to the appropriate taxing authorities.  This would ensure that a taxing authority did not receive real estate tax payments from multiple lenders on the same property for the same period, a situation that might lead to the discovery of the scheme.

H.  It was also a part of the scheme that monthly payments would be made on the "real" loans and "G" loans to prevent loan defaults and the initiation of foreclosure proceedings by the lenders, a situation that might lead to the discovery of the scheme.

I.  It was also a part of the scheme that each of the participants in the scheme would perform one or more of the following roles, including but not limited to being

- a nominal borrower, also referred to as a "straw" borrower or "straw" buyer (someone who agrees to allow his or her name and credit history to be used on loan applications; signs loan applications, promissory notes, mortgages, and other loan and closing documents; and allows others to sign his or her name on such documents);

- a recruiter (someone who recruits others to be straw borrowers);

- a loan processor (someone working under the direction of a mortgage broker/loan officer who assists straw borrowers in completing loan applications (Fannie Mae Form 1003s); creates, completes, and organizes documents for inclusion in loan packages; and ensures that loan packages meet the required conditions set by mortgage lenders);

- a mortgage broker/loan officer (a principal of, employee of, or agent of a licensed mortgage broker);

- a money controller (an authorized signer on a checking account into which proceeds of the scheme are transferred who distributes the proceeds under the general direction of an organizer/leader to pay the expenses of the scheme and to enrich the participants in the scheme); and

- an organizer/leader (someone who directs the manner and ways in

which false and fraudulent pretenses and representations are made to mortgage lenders and who directs how the proceeds of the scheme are distributed and used).

J.  It was also a part of the scheme that each of the participants in the scheme would get paid for participating in the scheme from the proceeds of "real" loans or "G" loans or from fees paid outside of closing (POC) by mortgage lenders.

K.  In the case of a "real" loan, the loan proceeds would be sent, usually by means of a wire transfer, to a bank account of a legitimate title company.  The title company, in turn, would provide some of the "real" loan proceeds to the participants in the scheme in the form of yield spread premiums, other fees payable in connection with the loan, and commissions.

L.  In the case of a "G" loan, the loan proceeds would be sent, usually by means of an interstate wire transfer, to a bank account located in metropolitan Detroit controlled by one or more of the participants in the scheme.  They, in turn, would distribute some of those funds to themselves and to other participants in the scheme, usually by means of checks or cash.

6.  Of the over 500 fraudulent mortgage loans embraced by this investigation, at least 80% went into default and were foreclosed on.  Losses to the lenders resulting from the scheme are expected to exceed $100 million.

7.  The information and evidence gathered during the course of this investigation also show that over 100 straw buyers were involved; that, on average, the mortgage loans ranged in size from $350,000 to $600,000 each; that approximately 180 different residential properties in metropolitan Detroit were used as – or falsely represented to mortgage lenders to be – the collateral for the loans; that many of the properties were used to secure multiple loans at the same time (one "real" loan and two or more "ghost" or "G" loans) even though only one of the multiple mortgage interests, or liens (the one for the "real" loan), was actually recorded at the county register of deeds; and that each

- 7 -

lender was led to believe that each of its loans was adequately secured by a properly recorded and unencumbered mortgage interest at the county register of deeds.

8.  The information and evidence gathered during the course of this investigation also show that for the "G" loans, the lending institutions would send the loan proceeds via interstate wire transfers to bank accounts in metropolitan Detroit controlled by one of more of the authorized signers listed below.  The names on the bank accounts purported to be those of legitimate title or escrow companies when in fact, as the signers knew, there was no association with legitimate title or escrow companies.

| *Account Name* | *Authorized Signer* | *Bank* |
|---|---|---|
| First Escrow Company, LLC | Ronnie Duke | Republic Bank |
| First Escrow Co., LLC | Ronnie Duke | TCF Bank |
| First Escrow Co., LLC | Ronnie Duke | JP Morgan Chase Bank |
| First Escrow Co., LLC | Ronnie Duke | JP Morgan Chase Bank |
| Liberty Title and Escrow Services | Robert Brierley | Republic Bank |
| Liberty Title and Escrow Services | Robert Brierley | JP Morgan Chase Bank |
| Lawyers Escrow | William Wells and Wilinevah Richardson | JP Morgan Chase Bank |
| Robert C. Brierley, DBA Nations Title of Ohio | Robert Brierley | National City Bank |
| Nations Title of Ohio | Robert Brierley | Comerica Bank |
| Nations Title of Ohio | Robert Brierley | JP Morgan Chase Bank |
| Emerald Title | Anthony Peters | TCF Bank |
| Motorcity Title & Escrow | Anthony Peters | TCF Bank |

| Blue Water Title | Robert Brierley | JP Morgan Chase Bank |
|---|---|---|
| Emerald Title | Anthony Peters | TCF Bank |

**9.** The information and evidence gathered during the course of this investigation also show that for the "G" loans, the proceeds were not distributed as reflected on the HUD-1 settlement statements because these were sham transactions. The properties were not actually sold, and thus there were no real sellers who had to be paid. Instead, those who controlled the proceeds of the "G" loans used the funds to make down payments on "real" loans; to make the monthly payments on "real" loans and "G" loans, to pay the straw buyers between for every fraudulent loan transaction they participated in (usually $5,000 to $15,000 per transaction); to pay the other participants in the scheme; to finance unrelated businesses (HARDCORE RACING – Ronnie Duke; HARDCORE MOTORSPORTS – William Wells; TRYST NIGHTCLUB – Nicole Turcheck); and to purchase for themselves a helicopter (Ronnie Duke), expensive cars (Ronnie Duke, Ryan Zundel (leases), Anthony Peters, Nicole Turcheck); boats (Nicole Turcheck), and expensive residential property (Ryan Zundel); and to travel extensively overseas (Ryan Zundel).

### 10560 White Lake Rd., Fenton, Michigan (12/19/2005)

**10.** Records were obtained from Option One Mortgage Corporation, Irvine, California. The following information was contained in those records:

A. On December 19, 2005, a person named Dennis Fitzpatrick, date of birth March XX, 194X, purchased a home from Jeffery and Debbie Starkey for $368,000.00. The home was located at 10560 White Lake Rd., Fenton, Michigan. Jay Baydoun was the mortgage loan officer for Premier Mortgage

Funding, Inc., a company located in Inkster, Michigan. As part of this transaction, the buyer obtained a $294,400.00 loan and mortgage from Option One Mortgage Corporation.

B. According to the credit application, Fitzpatrick possessed a date of birth of March XX, 194X was going to provide an $89,325.00 down payment from his own funds. According to the settlement statement, Fitzpatrick brought a down payment of $88,208.40 to the closing, which allegedly occurred at FIRST ESCROW COMPANY, LLC, 110 Trealout Drive, Fenton, Michigan. RONNIE DUKE acted as the notary public. On the closing date, Option One Mortgage Corporation wire transferred $292,399.77 from California to First Escrow Company's bank in Michigan. (According to records of the Michigan Bureau of Commercial Services, Ronnie Duke formed First Escrow Company, LLC in May 2003.)

C. On October 10, 2006, records were obtained from JP Morgan Chase Bank regarding account number 662124569 in the name of First Escrow Company, LLC. Based on the records, RONNIE DUKE held sole signatory authority on the account. On December 19, 2005, a wire was received in the amount of $292,399.77. It originated from Option One Mortgage and referenced the name Dennis Fitzpatrick.

**11.** Records were obtained from Best Bank, Milwaukee, Wisconsin. The following information was contained in these records:

A. On May 26, 2004, account number 273207423 was established in the name of JS REALTY, LLC, and NICOLE L. ROTHE, 31698 Day Lily Drive, Brownstown, Michigan. On August 19, 2004, the account was changed to reflect NICOLE TURCHECK as an affiliate of the account and as having sole signatory authority on it. The name then changed to JS Realty, LLC, and NICOLE L. TURCHECK, 31698 Day Lily Drive, Brownstown, Michigan. (According to records of the Michigan Bureau of Commercial Services, JS Realty, LLC was formed in August 2003, and Nicole Turcheck became its resident agent in August 2006.)

B. On December 23, 2005, a cashier's check dated the same date was deposited into the JS REALTY account. The check, in the amount of $30,000.00, originated from RONNIE DUKE, and indicated "SPECIALTY" as the remitter. (According to records of the Michigan Bureau of Commercial Services, Ronnie Duke formed several "Specialty" companies between 2001 and 2005, including SPECIALTY HOLDINGS and SPECIALTY FUNDING.) Also on December 23, 2005, a cashier's check was purchased with funds from the JS REALTY account in the amount of $12,500.00 and made payable to Dennis Fitzpatrick.

- 10 -

12. Records were obtained from Co-Op Services Credit Union pertaining to account number 209507-3-0. Based on the records, Dennis Fitzpatrick, Jr., date of birth August XX, 197X, held signatory authority on the account. On December 30, 2005, a cashier's check in the amount of $12,500.00 was deposited into the account. JS REALTY was identified as the remitter on the check.

13. On July 27, 2006, Debbie Starkey was interviewed by the FBI. Starkey and her husband, Jeffery, owned a residential home located at 10560 White Lake Rd., Fenton, Michigan. She stated that between December 2001 and March 2003, they tried to sell the home "by owner." During that time, WILLIAM WELLS presented an acceptable offer of $339,500.00 for the home and wanted to title it in his business name of SPECIALTY HOLDINGS, 110 Trealout Drive, Fenton, Michigan. The closing occurred at FIRST ESCROW COMPANY, LLC, also located at 110 Trealout Drive. (According to records of the Michigan Bureau of Commercial Services and Genesee County, Ronnie Duke formed several companies between 2001 and 2005 having the 110 Trealout address, including First Escrow Company, LLC.) In addition to Wells, RONNIE DUKE was also present for the closing. Duke presented himself as the owner of Specialty Holdings and First Escrow. After the closing, Duke presented them with a check which represented the balance that was owed to them. The check was drafted against an account held by SPECIALTY HOLDINGS. Starkey advised that has never heard of Dennis Fitzpatrick.

14. On October 17, 2007, confidential witness 1 (CW-1) advised that WILINEVAH RICHARDSON occupied a residence located at 10560 White Lake Road, Fenton,

- 11 -

Michigan, where she ran a mortgage branch. RICHARDSON, RONNIE DUKE, AND WILLIAM WELLS, worked on fraudulent mortgages out of this home. Richardson submitted the fraudulent loans to various lenders. In the course of this investigation, CW-1 has provided me with information on multiple occasions that I have determined to be accurate through a review of records and through information provided by other sources.

**15.** On August 20, 2009, I interviewed Dennis Michael Fitzpatrick, Sr. date of birth March XX, 194X. Fitzpatrick Sr. stated that his son, Dennis Michael Fitzpatrick, Jr., stole his identity and purchased eight or nine homes in his name. He stated that his son conspired to commit this fraud with RONNIE DUKE, NICOLE TURCHECK, and others.

## 10570 Cedar Valley Dr., Davisburg, Michigan

**16.** Records were obtained from Countrywide Home Loans, Plano, Texas. Countrywide purchased the loan from Mila, Inc. The following information was contained in those records:

> A. On April 6, 2006, a buyer identified as Alejandro Garcia purchased a home from Mike and Brenda Kalush for $449,000.00. The home was located at 10570 Cedar Valley Dr., Davisburg, Michigan. As part of this transaction, Garcia obtained a $359,200.00 loan and mortgage from Mila, Inc., Mountlake Terrace, Washington.

> B. According to the settlement statement, Garcia brought a down payment of $105,036.75 to the closing, which allegedly occurred at Nations Title of Ohio, 510 N. Main St., Suite 9, Belleville, Michigan. Garcia's credit application stated he earned $7,000.00 per month in income. On the closing date, Citibank, on behalf of Mila, Inc., wire transferred $359,864.24 from New York to NATIONS TITLE OF OHIO's bank in Michigan.

**17.** Records were obtained from JP Morgan Chase Bank regarding account

number 716567946 in the name of NATIONS TITLE OF OHIO. Based on the records, ROBERT BRIERLEY held sole signatory authority on the account. On April 6, 2006, a wire transfer to that account was made in the amount of $359,864.24. It originated from Citibank and referenced the name Alejandro Garcia.

18.   On October 18, 2007, I interviewed Alejandro Garcia. Garcia stated that in November 2005 he was introduced to RYAN ZUNDEL for the purpose of purchasing investment homes. Zundel promised Garcia $7,500 for each home that he purchased. He said that his company, BRETLIN HOME MORTGAGE, would make the 20% down payment and manage the home for Garcia. He would ensure it was rented and would collect the rent. In addition, Zundel said Bretlin would pay the property taxes and insurance.   Garcia gave Zundel his date of birth, social security number, and other pertinent information to apply for the loan.   Garcia subsequently attended the closing at NATIONS TITLE OF OHIO in Belleville, Michigan, whereby he purchased a home located at 10570 Cedar Valley, Davisburg, Michigan. Garcia, who earned approximately $50,000.00 per year at the time, did not provide any funds for closing. Instead, Zundel provided the funds. One of Zundel's co-conspirators delivered the monthly payments to Garcia for a short time so Garcia could pay the lender, but the payments eventually stopped. The house went into foreclosure.

19.   On June 14, 2010, I reviewed the Oakland County Land Records. There is no record of Garcia's acquisition of the property located at 10570 Cedar Valley, Davisburg, Michigan. Mike and Brenda Kalush appear to still own the property.

## 4400 Timberlake Trail, Highland, Michigan

20. Records were obtained from Option One Mortgage Corporation, Irvine, California. The following information was contained in those records:

A. On September 7, 2006, a buyer identified as Hugh James allegedly purchased a home from Richard and Lori Phipps for $595,000.00. The home was located at 4400 Timberlake Trail, Highland, Michigan. As part of this transaction, James obtained a $350,000.00 first loan and mortgage and $126,021.00 second loan and mortgage from Option One Mortgage Corporation.

B. According to the settlement statement, James brought a down payment of $125,590.56 to the closing, which allegedly occurred at LAWYERS ESCROW, 47448 Pontiac Trail #252, Wixom, Michigan. WILINEVAH RICHARDSON acted as the notary. On the closing date, Option Mortgage Corporation wire transferred $348,140.94 and $124,970.76, for the first and second loans, respectively, from California to Lawyers Escrow's bank in Michigan.

21. Records were obtained from JP Morgan Chase Bank regarding account number 656840444 in the name of LAWYERS ESCROW. Based on the records, WILLIAM WELLS held sole signatory authority on the account. On September 7, 2006, two wires were received in the amounts of $348,140.94 and $124,970.76. They originated from Option One Mortgage and referenced the name Hugh James.

22. On August 9, 2007, I interviewed Richard Phipps. Phipps stated that he built a home located at 4400 Timberlake Trail, Highland, Michigan in 2003. In March 2006, he attempted to sell the home and listed it "by owner" on the internet. In July 2006, BILL WELLS contacted Phipps and after looking at the home, offered Phipps his full asking price. Wells stated that he would need to have it appraised. Wells went on to say that he has investors and one of them may end up with the home. Phipps did not fully understand what Wells was

talking about.  An appraiser conducted an appraisal on the home.  A few months

later, Wells asked Phipps for the standard disclosures relating to the home.

Phipps provided these forms to Wells but never heard from Wells again.  A few

people have contacted Phipps and stated they have a loan on the house.  On

August 7, 2007, Phipps spoke to Hugh James.  According to James, he

purchased the house through BILL WELLS and signed papers at Wells' place of

business, HARDCORE MOTORSPORTS.  According to Phipps, he never sold the

home and still resides in it.

### 9826 Dublin Drive, Fenton, Michigan (04/28/2006)

23.  Records were obtained from Entrust Mortgage, Inc., Englewood, Colorado.

The following information was contained in those records:

A.  On April 28, 2006, a buyer identified as Lisa Bos purchased a home
from Hometowne Building Company, LLC for $362,935.00.  The home was
located at 9826 Dublin Drive, Fenton, Michigan.  Ricardo Rodriguez was the
mortgage loan officer for Bretlin Home Mortgage, a company located in
Belleville, Michigan.  As part of this transaction, Bos obtained a $290,300.00
loan and mortgage from Entrust Mortgage, Inc.

B.  According to the credit application, Bos was going to provide an
$88,317.83 down payment from her own funds.  According to the settlement
statement, Bos brought a down payment of $80,650.61 to the closing, which
allegedly occurred at MOTORCITY FINANCIAL SERVICES, 15505 Oakbrook #101,
Romulus, Michigan.  ANTHONY PETERS acted as the settlement agent and also
signed a Closing Protection Letter (later determined to be bogus).  On the
closing date, First Collateral Services, on behalf of Entrust Mortgage, Inc., wire
transferred $295,380.25 from New York to MOTORCITY FINANCIAL SERVICES' bank
account in Michigan.

C.  On July 24, 2007, records were obtained from TCF Bank regarding
account number 1883415221 in the name of MOTORCITY FINANCIAL SERVICES.

- 15 -

Based on the records, **ANTHONY PETERS** held sole signatory authority on the account. On April 28, 2006, a wire was received in the amount of $295,380.25. It originated from First Collateral Services and referenced the last name Bos.

**24.** On December 5, 2006, I interviewed Patrick O'Leary, owner of Hometowne Building Company. O'Leary's company was developing a subdivision called Irish Hills in Fenton, Michigan. One of the residential homes within the Irish Hills subdivision was located at 9826 Dublin. O'Leary stated that the home had not yet been sold, though his company had recently received a telephone call from an undisclosed bank inquiring about the ownership of the home. The bank official provided O'Leary with documentation including a warranty deed which reflected O'Leary purported signature as the seller. O'Leary stated that the signature was a forgery.

*************************************

**25.** There is, in addition, abundant evidence associated with these fraudulent mortgage loans, much of which is in the form of financial transfers and witness statements, connecting **RONNIE DUKE** to **WILLIAM WELLS, III** and **WILINEVAH RICHARDSON**; connecting **RONNIE DUKE** to **RYAN ZUNDEL** and **RYAN ZUNDEL** to **ANTHONY PETERS**; connecting **RONNIE DUKE** to **ROBERT BRIERLEY**; and connecting **RONNIE DUKE** to **NICOLE TURCHECK**.

**26.** Based upon the foregoing, there is probable cause to believe that Ronnie Duke, William Wells, Wilinevah Richardson, Ryan Zundel, Robert Brierley, Nicole Turcheck, and Anthony Peters conspired among themselves and with others to engage and participate in a scheme to defraud mortgage lenders and obtain money and

property by means of materially false and fraudulent pretenses and representations,

which scheme was furthered by the use of interstate wire transfers made to bank

accounts in metropolitan Detroit controlled by the defendants, in violation of Title 18,

United States Code, Section 1349 and 1343.

GREGORY R. BROWN, *Special Agent*
Federal Bureau of Investigation

Sworn to and subscribed before
me this 16th day of June 2010.

MARK A. RANDON
*United States Magistrate Judge*

- 17 -